1

2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

3    Salem Vegas, L.P. and Salem Vegas                )
     Investments, LLC,                                )
4                                                     )    Case No.: 2:12-cv-1892-GMN-CWH
                                                      )
5                        Plaintiffs,                  )
            vs.                                       )          **ORDER**
6                                                     )
     Anthony Guanci,                                  )
7                                                     )
                         Defendant.                   )
8    _____ )

9          Presently before the Court is the Motion to Dismiss, (ECF No. 98), filed by Defendant

10   Anthony Guanci.  Plaintiffs Salem Vegas, L.P. ("Salem Vegas") and Salem Vegas Investments,

11   LLC ("SV Investments") filed a Response in opposition, (ECF No. 122), and Defendant Guanci

12   filed a Reply, (ECF No. 123).  The Court entered a Minute Order on September 29, 2014,

13   granting the Motion and dismissing Plaintiffs' Second Amended Complaint.  The instant Order

14   sets forth the basis for that dismissal.

15         **I. BACKGROUND**

16         This case centers upon allegations that Defendant Guanci breached his duties as a

17   partner of Salem Vegas (1) by individually entering into a consulting services agreement with a

18   company that had received a loan from Salem Vegas, and, separately, (2) by unilaterally

19   executing a subordination agreement that could have delayed payments to Salem Vegas. (Sec.

20   Am. Compl., ECF No. 89).

21         Salem Vegas is a limited partnership formed under Delaware law by an agreement that

22   was executed in June 2005 (the "Partnership Agreement"). (Sec. Am. Compl. 2:3-3:13).  The

23   Partnership Agreement named Salem Realty, LLC[1] as Salem Vegas' general partner, and

24   _____

25   [1] Salem Realty was a limited liability company registered in Delaware whose managing members were
     Defendant Guanci and Stuart Kessler. (Sec. Am. Compl. 3:14-17).

1   Defendant Guanci, Eugene Kessler, Stuart Kessler, and Jack Kessler as limited partners. (*Id.* at

2   3:3-8).

3          The Partnership Agreement was formed in order to facilitate the partners' investment in

4   a resort construction project known as "Palms Place Vegas." (*Id.* at 2:27-3:2).  The resort was

5   to consist of "a 50 floor tower . . . consisting of 599 residential for-sale condominium units . . .

6   and common facility areas including a full-service spa, swimming pool, recreation spaces, and

7   shell bar and restaurant spaces." (Building Loan Agmt. at 8, ECF No. 39-6).  The development

8   of the project was overseen by Palms Place, LLC. (Sec. Am. Compl. 5:3-19).

9          Under the terms of the Partnership Agreement, Defendant Guanci had sole authority to

10  negotiate with Palms Place, LLC. (*Id.* at 4:1-4).  The Partnership Agreement specifically

11  provided that no "managing person"[2] could be held liable for any loss to Salem Vegas except in

12  the case of bad faith, gross negligence, or willful misconduct. (Partnership Agmt. § 9.5, ECF

13  No. 39-3).  The Partnership Agreement also contained a provision expressly allowing its

14  members to pursue other business opportunities, stating, "each Partner may have other business

15  interests and may engage in other activities in addition to those relating to [Salem Vegas], even

16  if such activities may be in competition with the business of [Salem Vegas]." (*Id.* at § 9.6).

17         In 2005, Defendant Guanci, on behalf of Salem Vegas, executed an agreement (the

18  "Salem Loan") providing that Salem Vegas would loan a sum of up to 10% of the costs of the

19  Palms Place Project that exceeded the amount provided under an anticipated construction loan.

20  (ECF No. 39-4).  In return, Salem Vegas was entitled to receive, *inter alia*, 10% of the proceeds

21  of the sale of each condominium unit. (*Id.* at 3).

22         In March 2005, around the same time that the Salem Loan Agreement was executed,

23  Defendant Guanci entered into a separate agreement with Palms Place, LLC which provided

24

25

---

[2] "Managing Person" is defined as "a General Partner, an officer of [Salem Vegas] or of the General Partner, and their agents." (Partnership Agmt. § 1.1, ECF No. 39-3).

1   that Defendant Guanci would advise Palms Place regarding planning, construction,

2   architecture, sales, and entitlements in order to ensure the project's timely completion (the

3   "Consulting Services Agreement"). (ECF No. 39-2).  In return, Palms Place agreed to pay a fee

4   of $1,000,000 to Defendant Guanci that would be distributed in equal monthly installments

5   from the proceeds of the anticipated construction loan. (*Id.*).  Plaintiffs allege that they did not

6   become aware of the Consulting Services Agreement until 2012. (Sec. Am. Compl., 6:16-18).

7        On March 13, 2006, Palms Place obtained a $240,000,000 loan for the project (the

8   "Building Loan"), funded by Wells Fargo Bank, Bank of Scotland, and JPMorgan Chase Bank

9   (the "Bank Lenders"). (ECF No. 39-6).  The Building Loan Agreement specified that the

10  distribution of these funds was contingent upon Salem Vegas' agreeing to subordinate its

11  interest under the Salem Loan. (*Id.* at 20).  On that same day, Defendant Guanci executed an

12  agreement (the "Subordination Agreement"), which rendered Salem Vegas' interest junior to

13  that of the Bank Lenders. (ECF No. 10-4).  Plaintiffs claim that they did not become aware of

14  the Subordination Agreement until 2012. (Sec. Am. Compl. 6:16-18).

15       Plaintiffs allege that Defendant Guanci's execution of the Consulting Services

16  Agreement and the Subordination Agreement delayed the repayment of the Salem Loan. (*Id.* at

17  4:23-25, 6:9-12).  Based on these allegations, the Second Amended Complaint sets forth claims

18  for (1) Breach of Contract, (2) Contractual Breach of the Implied Covenant of Good Faith and

19  Fair Dealing, (3) Breach of Fiduciary Duty, and (4) Tortious Breach of the Implied Covenant of

20  Good Faith and Fair Dealing. (*Id.* at 7:19-11:23).

21       In the instant Motion, Defendant Guanci argues that Plaintiffs fail to state a claim upon

22  which relief can be granted because his actions were specifically authorized by the Partnership

23  Agreement.  Thus, Defendant Guanci asserts that the all of Plaintiffs' claims should be

24  dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons discussed

25  herein, the Court will grant the motion and dismiss the Second Amended Complaint.

1

## II. LEGAL STANDARD

Dismissal is appropriate under Rule 12(b)(6) where a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal conclusions couched as a factual allegation are insufficient. *Twombly*, 550 U.S. at 555. Accordingly, Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). "However, material which is properly submitted as part of the complaint may be considered." *Id*. Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *E.g.*, *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). On a motion to dismiss, a court may also take judicial notice of "matters of public record." *Mack v. South Bay Beer Distrib*., 798 F.2d 1279, 1282 (9th Cir. 1986). Otherwise, if a court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgment. Fed. R. Civ. P. 12(d).

1    If the court grants a motion to dismiss for failure to state a claim, leave to amend should

2    be granted unless it is clear that the deficiencies of the complaint cannot be cured by

3    amendment. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).  Pursuant

4    to Rule 15(a), the court should "freely" give leave to amend "when justice so requires," and in

5    the absence of a reason such as "undue delay, bad faith or dilatory motive on the part of the

6    movant, repeated failure to cure deficiencies by amendments previously allowed, undue

7    prejudice to the opposing party by virtue of allowance of the amendment, futility of the

8    amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

9    **III. DISCUSSION**

10    As an initial matter, the Court has already ruled that Plaintiffs' claims are governed by

11    Delaware law, and therefore consults Delaware statutes and decisions of Delaware courts in

12    determining whether dismissal is warranted. (*See* Order Dismissing Pl.'s First Am. Compl.

13    5:14-19, ECF No. 86).  In his Motion, Defendant Guanci argues that, under the terms of the

14    Partnership Agreement, he possessed the authority to enter into the Consulting Services

15    Agreement and the Subordination Agreement.[3]  The Court will first address (A) the arguments

16    regarding the Consulting Services Agreement, followed by (B) the contentions relating to the

17    Subordination Agreement.

18    ///

19    ///

20

21    _____

22    [3] As each is expressly relied upon by the Second Amended Complaint and no party questions their authenticity,
the Court takes judicial notice of the Partnership Agreement (ECF No. 39-3), the Consulting Services Agreement
(ECF No. 39-2), the Salem Loan Agreement (ECF No. 39-4), the Subordination Agreement (ECF No. 10-4), and

23    the Building Loan Agreement (ECF Nos. 39-6, 39-7, 39-8). *See, e.g.*, *Swartz v. KPMG LLP*, 476 F.3d 756, 763
(9th Cir. 2007) ("[I]n order to prevent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting

24    documents upon which their claims are based, a court may consider a writing referenced in a complaint but not
explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned.")

25    (internal quotations omitted).

**A. The Consulting Services Agreement**

Defendant Guanci argues that Plaintiffs' breach of contract claim is invalid because the Partnership Agreement specifically permitted him to pursue other business opportunities. Indeed, Section 9.6 of the Partnership Agreement states:

> A Managing Person shall not be required to manage the Company as such Managing Person's sole and exclusive activity, and each Managing Person and each Partner may have other business interests and may engage in other activities in addition to those relating to the Company, *even if such activities may be in competition with the business of the Company*.

(Partnership Agmt. at 15, ECF No. 39-3) (emphasis added).

This claim relies upon the notion that the Consulting Services Agreement set Defendant Guanci's interests at odds with those of Salem Vegas, and that competing obligations and scarce financial resources may eventually have forced Palms Place to delay payments to Salem Vegas in order to fulfill its obligations to Defendant Guanci. Even assuming, *arguendo*, that this possibility created anything more than a *de minimis* conflict of interest, Defendant Guanci's actions fall squarely within the purview of Section 9.6. By entering into the Consulting Services Agreement, Defendant Guanci did nothing more than individually pursue a separate business opportunity, which was specifically permitted by the Partnership Agreement irrespective of whether it placed him in competition with Salem Vegas.

Plaintiffs argue that even if the Consulting Services Agreement constitutes a business activity permitted by Section 9.6, Defendant Guanci nonetheless breached Section 9.5 of the Partnership Agreement, which prohibits acts of bad faith, gross negligence, or willful misconduct. (Partnership Agmt. at 15). This section states, in relevant part:

> A Managing Person of the Company shall perform such Managing Person's duties, in good faith, in a manner such Managing Person reasonably believes to be in the best interests of the Company. A Managing Person does not, in any way, guarantee the return of the Partners' Capital Contributions or a profit for the Partners from the

> operations of the Company. A Managing Person shall not be responsible to any Partners because of a loss of their investment in the Company or a loss in the operations of the Company, unless the loss shall have been the result of the Managing Person not acting in good faith or such person's conduct constituted gross negligence or willful misconduct.

(*Id.*).  The facts of *Brinckerhoff v. Enbridge Energy Company* are acutely relevant to the instant action. 67 A.3d 369 (Del. 2013).  *Brinckerhoff*, involved claims for express and implied breaches of a partnership agreement based on allegations that a managing partner had improperly allowed its owner to fund a portion of the partnership's business venture in exchange for a share of the profits. *Id.* at 370-71.  The Delaware Supreme Court held that a claim for bad faith in the context of a partnership agreement requires allegations showing that a business decision was "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Id.* at 373 (quoting *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999)).  The court went on to find that the plaintiff had failed to sufficiently state a claim because the complaint did not "directly or by inference" indicate that the profit-sharing agreement was not simply a good-faith business transaction. *Id.*

Similarly, in the instant case, Plaintiffs fail to plausibly allege that the Consulting Services Agreement was executed in bad faith.  While the Complaint demonstrates that the financial burden created by the Consulting Services Agreement gave rise to a possibility that Palms Place might eventually choose to delay its payments to Salem Vegas, its allegations fall far short of showing that Defendant Guanci's decision to provide consulting services to Palms Place was "beyond the bounds of reasonable judgment."  Indeed, unlike *Brinckerhoff*, in which the managing partner signed an agreement that ultimately distributed profits to its owner instead of the partnership, the obligations created by the Consulting Services Agreement were entirely independent from Salem Vegas' business activities.  Therefore, Plaintiffs' allegations raise less of an implication of bad faith than the claims that were found lacking in *Brinckerhoff*.

1       Because the Partnership Agreement expressly allowed partners to pursue other business

2   endeavors and precluded individual liability except in cases of bad faith, the Court will dismiss

3   Count I as it relates to the Consulting Services Agreement.  As it is not certain that Plaintiffs

4   could not correct these deficiencies through amendment, this dismissal will be without

5   prejudice. *See DeSoto v. Yellow Freight Sys., Inc*., 957 F.2d 655, 658 (9th Cir. 1992).

6       Concordantly, the Court will also dismiss Plaintiffs' claims for Contractual (Count II)

7   and Tortious (Count IV) Breach of the Implied Covenant of Good Faith and Fair Dealing.  The

8   Delaware Supreme Court has consistently held that this covenant is "a limited and

9   extraordinary legal remedy" that does not apply to disputes "that could have been anticipated"

10   at the formation of a contract. *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010); *see also*

11   *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (holding that "one

12   generally cannot base a claim for breach of the implied covenant on conduct authorized by the

13   terms of the agreement").  Because Section 9.6 expressly authorizes Salem Vegas' members to

14   pursue other business opportunities, it is evident that the parties anticipated the possibility of

15   disputes over extrinsic business deals when the Partnership Agreement was signed.  Therefore,

16   Plaintiffs cannot raise a valid claim for breach of the implied covenant of good faith and fair

17   dealing regarding the Consulting Services Agreement.  As the presence of a controlling

18   contractual provision cannot be cured by amendment, the Court will dismiss Counts II and IV

19   with prejudice insofar as they relate to the Consulting Services Agreement.

20       Similarly, the Delaware Supreme Court has held that claims for breach of fiduciary duty

21   cannot be raised when the relevant conduct is addressed within the terms of a contract. *See,*

22   *e.g.*, *Nemec v. Shrader*, 991 A.2d 1120, 1128-29 (Del. 2010).  Therefore, because Section 9.6

23   expressly permits parties to engage in outside business activities, the Partnership Agreement

24   "supersede[s] and negate[s] any distinct fiduciary duties arising out of the same conduct." *Id.* at

25

1   1129.  As the presence of a controlling contractual term cannot be cured by amendment, Count

2   III will be dismissed with prejudice insofar as it relates to the Consulting Services Agreement.

3       **B.  The Subordination Agreement**

4       Defendant Guanci argues that his execution of the Subordination Agreement was

5   specifically authorized by Section 9.1(b) of the Partnership Agreement, which states:

6               The General Partner shall direct, manage and control the
            business of the Company and, subject to the limitations and
7           qualifications set forth in this Article 9, shall have full and complete
            authority, power and discretion to make any and all decisions and to
8           do any and all things which the General Partner shall deem to be
            reasonably required in light of the Company's business and
9           objectives.

10

11  (Partnership Agmt. at 11, ECF No 39-3).  Plaintiffs acknowledge that Defendant Guanci was a

12  "managing person" as defined in this section, but argue that the Subordination Agreement was

13  not reasonably required in light of Salem Vegas' objective to collect on its loan. (Pl.'s Resp. at

14  6, ECF No. 122).

15      With these allegations, Plaintiffs fail to consider the contents of the Building Loan

16  Agreement and the Partnership Agreement's limitations upon individual liability.  Section

17  3.1(i) of the Building Loan Agreement states that the disbursement of the $240,000,000 loan

18  was contingent upon Salem Vegas' agreeing to subordinate its interest to that of the Bank

19  Lenders. (Building Loan Agmt. at 20, ECF No. 39-6).  Additionally, the Subordination

20  Agreement states that its provisions are necessary to give effect to the Building Loan

21  Agreement. (Subordination Agmt. at 3, ECF No. 10-4).

22      From the face of these documents, it is apparent that the Bank Lenders insisted that their

23  interest be made senior to those of other lenders as a condition of their offer to loan the funds

24  necessary to construct the Palms Place Resort.  As the repayment of the Salem Loan was

25  contingent upon the eventual sale of the condominium units within the resort, it was certainly in

1   Salem Vegas' best interest to ensure that funds were available for the project's construction.

2   Thus, the Second Amended Complaint fails to plausibly allege that the Subordination

3   Agreement was unreasonable in light of Salem Vegas' business and objectives.

4         Because Plaintiffs' allegations fail to indicate that Defendant Guanci's execution of the

5   Subordination Agreement was unreasonable, they fall far short of demonstrating that this action

6   was "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on

7   any ground other than bad faith," as required to overcome the limitations contained in Section

8   9.5. *See Brinckerhoff*, 67 A.3d at 373.  Therefore, the Court will dismiss Count I insofar as it

9   relates to the Subordination Agreement.  Because it is not certain that Plaintiffs could not

10  correct these deficiencies through amendment, this dismissal will be without prejudice. *See*

11  *DeSoto*, 957 F.2d at 658.

12        Furthermore, as the authority to sign agreements on Salem Vegas' behalf is addressed

13  within the Partnership Agreement, the claims for breach of the implied covenant of good faith

14  and fair dealing and breach of fiduciary duty are invalid as a matter of law. *See Nemec*, 991

15  A.2d at 1128-29.  Thus, Claims II, III, and IV will each be dismissed with prejudice.

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

**IV. CONCLUSION**

**IT IS HEREBY ORDERED** that the Motion to Dismiss, (ECF No. 98), is **GRANTED**.

**IT IS FURTHER ORDERED** that Counts II, III, and IV of the Second Amended Complaint are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Count I of the Second Amended Complaint is **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs shall have until November 12, 2014, to file a third amended complaint in this action.  Failure to file by this deadline will result in dismissal with prejudice.

**DATED** this __17__ day of October, 2014.

_____
Gloria M. Navarro, Chief Judge
United States District Court